arguments not to exceed 15 minutes per side. Mr. Dennis Perez is a supervising attorney introducing Regina Garza, a law student who will present. Your Honors, it's my privilege to present to you Regina Garza, who is part of the Michigan Law School's Federal Appellate Litigation Clinic. We have previously moved for her permission to present the argument this morning. She has ably represented Mr. Barclay. We granted that motion. Thank you, Your Honor. You may proceed. Good morning. May it please the Court. My name is Regina Garza and I represent the appellant Mr. Delmar Barclay. Before I begin, I would like to reserve three minutes for rebuttal. You may. Thank you. Your Honors, Mr. Barclay's Fourth Amendment rights to be free from unreasonable search and seizure were violated in this case where there were no signs of ongoing danger to justify warrantless entry into his home after he was arrested and secured in a police vehicle. The District Court erred in denying his motion to suppress the evidence because of the warrantless intrusion into his home, a place where his Fourth Amendment protections are the strongest, cannot be founded on mere speculation of danger. Specifically, despite the arrest of the only known suspect in this case, the District Court relied on officer speculation of danger to apply two theories. Those are protective sweep, incident to arrest, and exigent circumstance due to risk of danger. It's rather the central issue here, isn't it? What's your best argument for why they have arrested the known suspect? Our best argument is that Mr. Barclay was the only individual who fit the description that at least that the officers had information about prior to the entry. Prior to the entry, one of the neighbors that had a view of the backyard indicated that there was one man who discharged a gun in the backyard. When officers arrived, they similarly only heard the voice of one man. And after Mr. Barclay exited the home and was arrested, they made no other indications to suggest that there was another man that remained in the home that could have fit that description. And the case law in this area, particularly with reference to exigent circumstance, when officers' concern is that the individual that they're seeking in the home is the source of the danger, it requires not only officers' concern that there's a weapon and that there are occupants in there, but most importantly that any of those occupants have to have a willingness to use the weapon. Wasn't there a second 9-1-1 call that indicated, based upon the perspective of a neighbor, that there was some argument going on in the house involving more than one person on an upper floor and there was no identification as to gender or other characteristics of those people who were engaged in some sort of argument? Is that correct? Yes, Your Honor, but let me clarify because there were actually two different issues. The neighbor, when they called, were reporting hearing Mr. Barclay engage with the officers and that was the report of the exchange that you're referring to, Judge Cole. However, the point of reference on the dispute that the officers heard, that was in reference that they claimed to hear, that was in reference to the loud voices that the district court noted when officers arrived at the house of a man and a woman. The second call said there are people on the second floor or a person on the second floor. And what I would put to you is this, and tell me if there are other cases favorable to you that would come close to this. We have, in effect, a weapon on the loose. That is, a gun has been discharged. The man does not have the gun. There are some cases where you find the gun and you say there might be others. But we know that the weapon is missing. We know that there are people in the house and specifically the call about the person on the second floor. And thirdly, we have the man repeatedly saying, there's nobody in the house. So doesn't that up the potential of danger that they're not speculating that there's somebody in the house. They're not speculating there's a weapon in the house. And while you're right, they don't know for a fact that they are members of the same gang, we know that he at least seems to be trying to conceal their presence. Yes, Your Honor, all of what you've mentioned is true. However, this court's precedent is clear. So for example, we would point to three specific cases. United States v. Morgan, United States v. Kinney, and United States v. Bates. The importance of United States v. Morgan is you have a similar situation where police were called into a scene where multiple defendants, or excuse me, not defendants, but multiple individuals were seen discharging firearms. Later, more so than in this case, it was concerning because police actually saw those individuals exit from a vehicle and bring the weapons into one of the defendant's homes, grandmother, excuse me, mother's homes. And in that case, once the police were able to call the defendant out, the court found that despite the fact that officers knew there to be other occupants in the home and weapons, and that there was a firearm discharge, they found that there were no exigent circumstance. And even though this particular case predates Marilyn v. Bowie, this court did analyze it under Terry v. Ohio, under similar factors of specific articulable facts and rational inferences from those facts. And under both theories, this court found that there was no basis for officers to make entry after the defendant came outside and was arrested outside. Did you cite that in your brief? No, I'm sorry, your honor, I did not. I can provide you the citation. We can look it up, but I did read a fair number of the cases, and that wasn't one. You did cite Bates, but I don't think you cited Kinney either. Yes, and I can explain the significance of Kinney as well. With Kinney, that was- Let me, we can look at that. Let me go back to Bowie, though, because the courts talk about the second Bowie standard, which seems to be a kind of a reasonable suspicion, things that would allow an officer of reasonable prudence to be concerned that there might be danger to them or others. Is that a fair reading of the standard? That's correct, your honor. And so again, here, it's clearly not certain that there's danger. But the three facts that I mentioned are not those reasonable, articulable facts. They're reasonable, articulable facts, but they're only directly relevant to Mr. Barclay himself. He's the only one that actually matched the description of the individual that they knew demonstrated a willingness to use a weapon. So you're adding the, you need to have reasons that somebody is willing to use the weapon. That's correct, your honor. In this particular case, for a protective sweep, they would either need the suspicion to establish that there were either multiple dangerous people involved in the offense that they were investigating, or that there were multiple individuals that met the description of the individual they were seeking. Wouldn't it be reasonable for an officer to conclude that there were others in the house who possibly might be willing and able to use this shotgun that's, quote, unquote, on the loose, that's somewhere in the house? In some cases, it may be, but on the facts of this case, your honors, the problem is that the only evidence that they knew is there was one man and one woman. And even if they had believed that there might have been more than just the two of those individuals in the home, what the Fourth Amendment requires in a situation where you're dealing with the sanctity of privacy in a private citizen's home, it requires more than just suspicion that one of those other individuals might have possessed the ability to use the weapon. And this is where Kinney is particularly significant. In that case, the officers had arrested the defendant outside of his home. And they claimed that noises of sounds from the back entrance of the home, as well as the movement from the window, suggested that there were other occupants. And therefore, they needed to do a protective sweep of the home. However, this court made clear that both of those factors only indicate that the home is occupied. And to uphold the legality of the search under- Were there evidence of weapons in the house? The same sort of thing here, sort of recently used weapons? Not recently, there were recently used weapons in terms of the crime they were investigating. In that case, they were investigating- Crime that happened someplace else. Exactly, your honor. It was an armed robbery. And so in that case, they certainly would have had suspicion, particularly in Kinney itself. Because the defendant in that case, they actually knew about his prior criminal history. And knew that he had had prior violent tendencies, including actually pointing or using a firearm against his brother-in-law. In this case, are you taking any inferential comfort because the only person we know is in the house is a female? At this point, all that matters in this case is what the officers knew prior to entry. And that is what the relevant facts are. And in order to uphold the Fourth Amendment protection, you need to have that additional factor that shows that the additional occupants they believe to be in there somehow pose a danger to them. Is it reasonable for them to have thought that the report from the person on the second floor was, as it turned out to be, although they were children, was additional to the woman? That is, my reading of the record was things were happening quite fast. And that they were at the front door knocking roughly the same time they were getting the report of the person on the second floor. So would it be reasonable for an officer to believe that there were at least two people in the house? The one who was coming to the door and the one that was reported on the second floor? It's not as strong of a basis as knowing that there was at least one other occupant. Because by the time that the neighbor reported seeing movement in the window, the officers were already away from the door. They didn't indicate that they continued hearing sounds from the door. They were already away from the door. Oh, I'm sorry. The one officer was still at the door, but she didn't indicate continuing noises coming from the main floor. So it was equally reasonable that the movement they saw from the upstairs window was also the woman's voice they heard. And based on those facts, again, you know, we point right back to United States v. Kinney, where in that case the officers had no idea who was in the home. And yet, what this court has been clear. They had no idea who or they had no idea that anyone was in the home? They had no idea that who was in the home at that point. Thought someone was. Because when the defendant came out and they arrested him, that's when officers noted that they heard sounds from the back door as well as movement from the window. And so that would have suggested there were multiple individuals in the home. So essentially, there was no basis for finding a third person to be dangerous to the officers. Particularly when you consider that the government's basis and the reasoning for the need for protection was that they needed to transport Mr. Barclay from the back of the home past the side to the front. However, when you read the testimonies of the officers at the, I apologize, your honors, I see my time's expired. Thank you, your honors. When you consider that by the time the officers made entry, the suppression hearing makes clear that all the officers are consistent in indicating that Mr. Barclay was in the police vehicle prior to entry. Thank you, counsel. You'll have your time for rebuttal. Thank you. Good morning. May it please this honorable court on behalf of the appellee of the United States of America. I'm Assistant United States Attorney Justin Seabury Gould, replacing retired Assistant United States Attorney Gregory Sassay. And now ask this court to deny the defendant's assignments of error and affirm the conviction below. The United States has made two arguments, first as to sufficiency. I will spend the most of my argument addressing the second portion, exigency. But we'll address the first, sufficiency, so that we go in order of our arguments. Your honors, this court does not need to reach the issue of whether or not there was a constitutional violation. Because there is a string from the time that the defendant was arrested to now of uncontested facts that were not part of the defendant's motion to suppress. Specifically, I am addressing the cartridges which were found strewn. Is this, I'd really like to hear your argument about entry. I don't want to foreclose that argument. You said your more significant argument is the second. Give me your best argument for how you got in the front door. There are two arguments as to why the officers entered that day. Exigency, as you are aware, can be established by two methods. First, under Minnesota versus Olson, we're talking about exigency established by an imminent risk of harm to police officers. This being the people who are outside of a home. The second way the exigency is established is United States versus Huffman. This being exigency because of harm that could be caused or may have been caused to those inside of the home. I will begin by talking about the exigency established in this case by the possibility of harm to those outside of the home. The officers, the witnesses, and the residences. As this court has already noted, there were three 911 calls placed that evening. The first from Bertha Rodriguez, which begins at page ID 241, where she describes that there were five shots fired immediately outside of the home. She saw muzzled by last, and she saw a man turn and immediately enter the home that evening. The second 911 call was placed by Courtney Tomazine, which begins at page ID 234. Where she says that she too heard five shots fired. It is at that time that officers arrive at the home. They hear an argument at the front door. This is Officer Brown, who recounts hearing the argument. And in fact, hears a male voice state, I wasn't even close, at page ID 248. The defendant, or man, later identified as the defendant, opens the door, tells the officers, hold on, then slams the door in their face and begins to run to the back of the home, page ID 249. The defendant then exits the home and is arrested on the ground, screaming there's nobody inside, there's nobody else inside of that house. It is at that point that Ms. Tomazine places her second 911 call, page ID 236, to say, listen officers, I just want you to be safe here. I hear that man outside saying there's nobody inside of that home, there's nobody inside of that home, but I'm looking right now inside of a lit bedroom on the second floor and I see someone in there. And it's because of that information that there was a weapon inside of that home, because it didn't come out with the defendant, but we saw it go in because of the first 911 calls from Ms. Rodriguez. And the fact that there was a person moving inside of the home, which the man outside was trying to convince officers was not inside, that could have led... And what is the relationship between that information and the attempted entry? Doesn't Officer Brown testify that she was not in the door, that the request for entry, the demand for entry and the forcible entry did not occur until the officers were at the police cruiser and the suspect was in it? You are correct, Your Honor, that the suspect, the man outside at that time was inside. But what the appellant would have you do is to look back and say, well, there was a man seen outside and there was a man taken into custody, so therefore there was no man. And in fact, we know that there was no man because there were only females and children inside of the home upon their search. That's not the standard that this court uses. It is what the officers knew at that time. And when they... But the question is, the question is the time. The cases that talk about timing, talk about police officers arriving at an emergency scene, coming out of the cruiser, going to the door, demanding entry. I'm not sure yours is that case. You have a case in which they go to the door, knock, knock, knock. He comes in and says, be right back, and heads out the back door. They arrest him. They bring him around. They put him in the police car. That's done. Now Officer Brown is at the door saying, let me in, let me in. I think it's Lamb who leaves the police cruiser after the suspect is put in the back of it and goes to the door and then there's the forcible entry. So at the time, the situation that we're talking about now is the time of the entry. So at the time of the entry, what is it? The two officers are standing at the door, suspects in the police cruiser. They're not walking around subject to being shot from a window. They're in. So what is the exigency that gets you in the front door? Well, certainly, Your Honor, what I'm hearing the court say is that you question whether or not the officers who are people outside of the home were still in danger, that they could have been shot at by whoever may have been inside of the home, ably ready and willing to utilize the unlocated weapon. If that is the case, and the court does not accept that argument, that a person inside of the home could have shot at people outside of the home because of the delay in time that the officers had to bring the defendant to the front, there is still the second type of exigency from United States v. Huffman. And that is exigency established by a harm to persons inside of the home. Well, but let's, I would like to finish up on the entry at the front door because we're talking about what did the officers think? You know, our Archibald case talks about the fatal funnel. When do police officers stand in the fatal frontal at the front door knocking for entry? And my understanding is the law pretty well says that police officers avoid that fatal funnel when they know that there is a danger inside. You've got two officers standing there at the door saying, let us in, we're coming in, right in the fatal funnel. What is it, what is it that, you know, what evidence, what reasonable objective evidence do you have that those officers were afraid at that point? The fatal funnel which the court cites from Archibald is clearly, that case is clearly distinguished from the facts of this case. In Archibald, there was no other person or signs of another person inside of the home, whereas here there were. And in that case, there was no indication of a threat or harm imminently to any of the officers there. The officers in Archibald were simply there to serve an arrest warrant. In this case, you have indications of a person on the second floor. You have a firearm which is unlocated and immediately fired. You have people inside of the home and the sounds of an argument upon the officer's arrival. And this is similar in United States v. Huffman, where the exigent circumstances are established that not only are we looking at people who may have been shooting outside of the home, harming those outside, what about the people inside? And these officers would... What does Huffman have? Huffman has bullet holes in the interior, bullet holes in the exterior, and shattered glass everywhere. What have you got in this case that replicates that kind of danger? Well, in Huffman, the fact that you have such overwhelming evidence as to the broken glass, as to the holes in the walls, is metered by the fact that the officers don't arrive for eight hours. It's not necessarily any sign that the house has just been fired into. Their officers in Michigan arrived, like I said, eight hours after reports of shots fired were had. In this case, we are talking about officers arriving immediately after 3911 calls, and they would be derelict in their duty if they said, hold on, rather than going into this home where somebody... We heard arguments. We know that there's a gun. We know that there were shots fired. We want to see if anyone is injured. We're going to hold off. We're going to have an investigation outside of the home. Let's look around to see if there are any bullet holes. Somebody could be bleeding and dying inside of that home, and that is why those officers went in. They had two reasons. One, because of somebody shooting from the inside out, Minnesota versus Olson. The second, the possibility that immediately after shots were fired, when they know people are inside of that home, and the man that's outside of the home is telling them, no one's inside, no one's inside, that he could have been covering up the fact that somebody inside of that home was shot and dying. And that second way to establish exigency, United States versus Huffman, is clear in this, applies here, because officers, when entering the home, also had reason to believe that somebody could have been injured inside. But what is the strongest argument that there may have been someone inside the house who was in need of emergency aid? Is it just that there was this argument inside the house, the gun has not yet been located? Don't know how many people are inside the house or what their intentions are? I mean, what's your best argument that someone inside the house may have been in need of emergency aid? Each of those is a reason why the officers had reason to believe that somebody may have been injured inside. The fact that we have shots fired in a residential area very close to the back of the home, we see muzzle shots, muzzle fire from the gun. Second, that officers arrive to hear arguments inside of the home, and that they hear a male say, I wasn't even close. Then a male exits the home and attempts to dissuade them from entering the home. Now I believe that the defense, I believe that the appellant will argue that a female entered the door and she said everything was fine inside and that there was nobody, that there was no one injured inside. And it is that person who also stated that she was the one who locked the back door when the defendant ran out of it. That she sat there as officers were announcing themselves, knocking and trying to gain entry to the home. And so it's reasonable to believe that officers who were attempting to see if anyone was injured inside of that home would find her to be possibly complicit because she locks the back door after the man tries to run out the back.  Is it reasonable to believe that, for the officers to have believed that there could have been another male inside the house and possible male suspect of some sort? Absolutely, your honor. And why is that? Because when Ms. Tomazine places her second 911 call to inform them that there's another person inside of the home on the second floor, there is no reference to gender at that time. And even if there were, there's still no way to eliminate whether or not there is another male inside of that home. Are females always less dangerous than males? No, your honor. At least from my reading in the popular press, this fellow in Las Vegas confronted the male of two suspects and was then shot dead by the female. At least that's what the press indicated. I believe that the officer... That's why I asked your adversary, was she getting any comfort if they were all females? No, and I don't believe our officers would either as they had an unsecured weapon which could have been fired by a complicit female. Were the officers, did they have their guns out when they then went to the door? Your honor, I do not recall whether or not weapons were drawn by the officers at the time that they had entered the home. My memory was yes, but I didn't have a citation. So we can look that up. Okay, go ahead. But the identification of the male that was sort of the description by the first 911 caller was not such that the officers would know that Mr. Barkley was that particular male as I understand the government's argument. No, your honor. The simple, the description was only that there was a figure that appeared to be that of a man. So this person, Ms. Tomazine, was looking outside of her window. The first call she says it's kind of difficult to see because it's dark and because it's, she doesn't have a clear view because also she's afraid because someone's been firing weapons in the backyard. But after that time she calls and says, excuse me, it's Ms. Rodriguez that states she sees the figure in the back of the home and that it is a male figure. She can't see any details. She doesn't give clothing description. She doesn't give, you know... But it's not real plausible that the guy in the cruiser is not the shooter, is it? I mean, it's conceivable, but that's not the better argument of reasonableness, is it? I certainly don't believe that there's reason to, that these officers at the time that they were there, immediately after these shots were fired, would have any reason to believe that there wasn't another male inside of the home. I certainly believe as we look back and see that there was only one male, that he was running outside of the home, that there was a male figure described, that it would be reasonable to conclude that he was. And if this court finds that, then you still have the second method, the Huffman method of exigency, that there could have been somebody harmed inside of the home. Unless there are any further questions? Thank you. Thank you, counsel. Garza, you have three minutes for rebuttal. Don't you have a problem with the statements made by Mr. Barclay? One, there's nobody in the house, there's nobody in the house. Thomasine calls and says, oh yes, there is somebody in the house. And then, am I remembering the record correctly, that then he says, don't let him in. Then Barclay's out in the backyard, don't let him in, don't let him in. How do you account for that relative to the possibility of revealing an exigency? Yes, your honor. Your honor is correct on both of the facts mentioned. However, we want to clarify first that neither fact was found relevant by the district court in its ruling. The district court only found relevant that there were shots fired, the home was occupied, and the individual seen discharging the weapon went into the home. Those are the only three. We're looking at the whole record. So, convince me why that doesn't, I'm assuming we're all in agreement. It's the entry that's the problem. We are talking about exigent circumstances. The briefs kind of mush those together with protective sweep and exigency, but they are completely separate. So, how are you going to say they couldn't get in the front door? Yes, your honor. On the two facts that you mentioned, again, the important factor to notice is that both the dishonesty and the fact that he, I'm sorry, what was the other part of the, the other fact that you were concerned about? I'm concerned about the things he said. Oh, yes. We do have, there's some other facts that are problematic for you, but we've got the guy out there saying there's nobody there, there's nobody there, then talking to the nobody and yelling, don't let him in. Yes, your honor. And that's true. He did say these things, but the important thing to recognize is those, his statements only are directly applicable to his own character and his own respective danger to the officers. Why don't they imply that there's something not quite right in the house, either people who are complicit or people who are under coercion or something of that sort? It's not certain, but don't they lean in that direction? Yes, your honor. They certainly could have had a suspicion, but again, that is all they had, a suspicion. In such cases, had they truly been concerned, there was nothing to preclude them from securing the home and attempting to get a warrant at that point in order to make entry. That certainly wouldn't help if there were people in the house either injured or under coercion. Plus, if there really are armed people who are hostile, securing the home isn't really the best idea, is it? Your honor, you're correct that if there were evidence that someone might have been injured, then it would make sense. But as Judge Staunch had questioned the government on the facts of this case, in a case like United States v. Hoffman, yes, it makes sense when you have broken glass and clear evidence that bullets went into a home that appeared occupied, that the police might be concerned. I'm sorry, your honor. Let me ask you one question before you go. We didn't talk about the Colbert case, which is our case, which did allow suppression in that particular case, but that's the case where it said there isn't a bright line for a protective sweep, where it says that the fact that an arrest takes place outside rather than inside affects only whether there's a reasonable articulable suspicion, so that a protective sweep can extend from outside a house to inside a house. Do you have any comment on the Colbert case? Yes. So with Colbert, the main point and the one that we think is most relevant in this case is that you can't impute factors that are relevant to the person that the officers have arrested. You can't impute those factors of dangerousness to other people without additional factors that actually point directly to that. That's really our issue here is how much of those additional factors do we have. We'll have to decide that. Thank you, counsel. Case will be submitted. Clerk may call the next case.